# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 87136-6-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| PAIGE L. CRATON, | |
| Appellant. | |

FELDMAN, J. — Paige L. Craton appeals her conviction for burglary in the second degree.  Because the trial court erred by granting the State's peremptory challenge against juror 27, who identified as Asian, over Craton's GR 37 objection, we reverse Craton's conviction and remand for a new trial.  We also exercise our discretion to address two evidentiary issues that may recur on remand: (a) whether the trial court abused its discretion by admitting evidence of flight from police as evidence of consciousness of guilt and (b) whether the trial court abused its discretion by admitting an unavailable witness's hearsay statement as a statement against interest under ER 804(b)(3).

I

On September 16, 2023, around 8:30 p.m., James Bushman and an unidentified woman entered the Public Storage facility in Sammamish,

Washington, in a white Volkswagen GTI. They had rented a storage unit through the facility's website using the name "Michael Everett" and had obtained an access code to the facility. Once inside the facility, they broke into several storage units, took items from inside the units, and placed them inside their vehicle. Bushman wore an orange jacket, light colored camo pants, black and red tennis shoes, and a hat and face mask, and the woman wore a black jacket, black pants, black fuzzy boots, and a face mask. After they loaded their vehicle with items from the storage units, Bushman drove to a locked gate, cut the lock, and drove away. These events were captured on the facility's security videos.

The next day, the Public Storage property manager noticed there were several unit doors with bent latches. The manager called the police and reviewed the security videos from the previous night. Detective Keith Gaffin from the King County Sherrif's Office also reviewed the security video and sent a screenshot of the white Volkswagen captured on the video to surrounding law enforcement agencies. The vehicle had several distinctive features, including a missing front bumper, a figure hanging from the rear windshield wiper, a trunk that was not fully closed, and stickers in the upper left corner of the windshield. Soon thereafter, on September 19, Officer Matthew Saul, a patrol officer for the City of Lynnwood, observed the same white Volkswagen near Lynnwood as he was driving to work. Officer Saul followed the vehicle until it was parked in a cemetery. Other law enforcement officers approached the vehicle and contacted its two occupants who were later identified as Bushman and Craton. Bushman then reversed the vehicle, nearly colliding with one of the police vehicles, and crashed into a tree. After the

crash, Bushman and Craton ran from the scene but were both soon captured and arrested.

During law enforcement's investigation, Detective Gaffin took photos of Craton's and Bushman's belongings. The boots Craton wore when she was arrested were the same type of boots worn by the female burglar shown on the security video. Bushman's belongings included camo pants and black and red shoes that looked like those worn by the male burglar shown on the security video. Additionally, law enforcement searched the white Volkswagen and discovered several items connected to the Public Storage burglary. These items included an identification card belonging to "Michael Everett," an orange jacket like the jacket Bushman wore on September 16, a tool like the one used to break into the storage units, and a pawn slip indicating Bushman sold certain stolen items at a pawn shop.

Bushman and Craton were both charged with burglary in the second degree and were tried separately. Bushman was released before his trial began and had several phone conversations with Detective Gaffin. During these conversations, Bushman admitted to being at the Public Storage facility and cutting the lock that secured the facility's gate, and he indicated he wanted to take responsibility for the burglary. Bushman also returned some of the stolen property to law enforcement. On September 27, 2023, Bushman called Craton, who was still in jail, and told her, "So the detectives say they need to talk to you. I told them that I - - everything was on me, so." Following a jury trial, Craton was found guilty of burglary in the second

degree and sentenced to a standard range of 17 months in custody. This timely appeal followed.

II

Craton's lead argument on appeal is that the trial court violated GR 37 by overruling her objection to the State's preemptory challenge regarding juror 27, who identified as Asian, and excusing him from the venire. We agree.

During voir dire, the State asked the prospective jurors if any of them had previously served on a jury. Juror 27 indicated he had previously served on a jury in a criminal matter. The following exchange ensued:

> PROSECUTOR: Criminal, okay. And without telling me the outcome, were you able to reach a verdict in that case?
> JUROR 27: No.
> PROSECUTOR: You were not, okay. And for your experience on that criminal trial did the members of the jury work well together?
> JUROR 27: Yes.
> PROSECUTOR: Okay. And how was your overall experience? Was there any likes or dislikes with regards to the jury panel?
> JUROR 27: No, it was okay.
> PROSECUTOR: It was okay.

After this exchange, the State asked similar questions to the other prospective jurors who had indicated that they had previously served on a jury. The State then asked the prospective jurors who had previously served on a jury if they had been the presiding juror. Juror 27 indicated that he had not served as the presiding juror. The State did not ask juror 27 any further questions about his previous experience serving on a jury.

After voir dire, the State directed its first peremptory challenge against juror 27. Craton objected based on GR 37 because juror 27 had indicated on his

questionnaire that he identified as Asian. In response to the trial court's request for the State's basis for moving to exclude juror 27, the State answered,

> [W]ith regards to this juror I know we didn't really get too much of an opportunity to speak with this juror. I think I asked them questions with regards to their juror service. They had mentioned they were unsuccessfully able to reach a verdict in the last jury service. State did have concerns on their ability with regards to joining this jury and being able to reach a verdict as well.

The trial court then confirmed that the State's basis for its peremptory challenge against juror 27 was that he had been "on a jury and were not able to reach a verdict in a prior jury service." The State replied, "That's correct." Craton maintained her objection to the State's peremptory challenge based on GR 37.

The court then ruled on Craton's GR 37 objection as follows:

> This juror identifies as Asian. There are a number of other Asian members of the panel who are currently seated. I'm going to reserve as to this juror pending resolution of others. I will - - I'm going to overrule the motion and grant the peremptory as to this. I think that the - - there is - - the state has articulated a basis upon which to exclude this juror that is nondiscriminatory. I don't believe there's evidence other than that that would suggest there is exclusion for bias. So on that basis I'm going to overrule the GR 37 objection with respect to excluding juror 27.

Craton claims the trial court erred in so ruling because an objective observer could view race or ethnicity as a factor in the State's peremptory challenge of juror 27.

The purpose of GR 37 is to "eliminate the unfair exclusion of potential jurors based on race or ethnicity" through the use of peremptory challenges. GR 37(a). Under GR 37(c), "[a] party may object to the use of a peremptory challenge to raise the issue of improper bias." Following such an objection, "the party exercising the peremptory challenge shall articulate the reasons the peremptory challenge has been exercised." GR 37(d). The court "shall then evaluate the reasons given to

justify the peremptory challenge in light of the totality of circumstances." GR 37(e). The court "shall" deny the challenge if it determines "an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge." *Id.* "GR 37 does not require a showing of purposeful discrimination but rather whether the possibility of discrimination could exist in the eyes of an objective observer." *State v. Hernandez*, 30 Wn. App. 2d 179, 190, 544 P.3d 542 (2024). "[A]n objective observer is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in Washington State." GR 37(f).

GR 37(g) provides a non-exhaustive list of "circumstances the court should consider" in ruling on a GR 37 objection. Our Supreme Court has emphasized that GR 37(g) "is not a checklist for trial courts to cross off but, instead, factors to be considered in making a determination." *State v. Tesfasilasye*, 200 Wn.2d 345, 358, 518 P.3d 193 (2022). GR 37(h), in turn, lists several reasons for exercising a peremptory challenge that are "presumptively invalid." Lastly, GR 37(i), entitled "Reliance on Conduct," provides a list of conduct-related reasons for peremptory challenges that "also have historically been associated with improper discrimination in jury selection in Washington State." Because GR 37(e) requires courts to evaluate the reasons given to justify the peremptory challenge in light of the totality of the circumstances, "we give equal weight to all of the evidence when determining whether race 'could' have been a factor." *State v. Booth*, 22 Wn. App. 2d 565, 573, 510 P.3d 1025 (2022).

Importantly, "GR 37 was written in terms of possibilities, not actualities." *State v. Lahman*, 17 Wn. App. 2d 925, 938, 488 P.3d 881 (2021) (published in part). The rule recognizes that "the trial process must be free from the appearance of discrimination, regardless of actual motives or intent," and it "teaches that peremptory strikes exercised against prospective jurors who appear to be members of racial or ethnic minority groups must be treated with skepticism and considerable caution." *Id.* Additionally, "GR 37(f) discourage[s] acceptance of . . . vague and unsubstantiated reasons on the basis that they might mask conscious or unconscious bias." *State v. Omar*, 12 Wn. App. 2d 747, 754, 460 P.3d 225 (2020). We review the trial court's GR 37 ruling de novo because "the primary focus on review is whether an objective observer could view race or ethnicity in the use of the peremptory challenge." *State v. Bell*, 5 Wn.3d 54, 65, 571 P.3d 272 (2025). "[T]he remedy for a GR 37 violation is reversal." *Tesfasilasye*, 200 Wn.2d at 362.

*State v. Hale*, 28 Wn. App. 2d 619, 537 P.3d 707 (2023), a recent Division Two opinion, identifies three specific circumstances where appellate courts have determined trial courts erred by overruling a GR 37 objection to a peremptory challenge. First, the reason given for the peremptory challenge cannot be one that is similar to a presumptively invalid reason under GR 37(h) or one that has historically been associated with improper discrimination in jury selection under GR 37(i). *Id.* at 632. Second, the record must support the reason given for the peremptory challenge. *Id.* at 633. And third, the reason given for the peremptory challenge must not be vague or questionable. *Id.* at 634.

Here, the second circumstance identified in *Hale*—the requirement of record support for the proffered reason—is dispositive. In response to the trial court's request for the State's basis for its challenge against juror 27, the State asserted it had "concerns on [juror 27's] ability with regards to joining this jury and being able to reach a verdict as well." The State's reason is wholly unsupported by the trial record. Juror 27's statements during voir dire fail to support the proposition that he lacked the ability to "join the jury" or would not be able to reach a verdict in Craton's trial. Rather, all that juror 27's statements demonstrated was that the members of the jury he previously served on worked well together and his experience serving on that jury was "okay."

*Tesfasilasye* is instructive on this point. There, our Supreme Court concluded the trial court erred in granting the State's peremptory challenges against an Asian juror and a Latino juror when the record did not support the State's proffered reasons for its peremptory challenges. 200 Wn.2d at 359. Regarding the Asian juror, one of the State's proffered reasons for its peremptory challenge—that the juror could not be fair to both sides—was "simply not established in [the] record." *Id.* And regarding the Latino juror, the State misrepresented the juror's statements during its proffer to the court. *Id.* at 354-55, 360-61. Consequently, the Supreme Court concluded an objective observer could view race as a factor for striking both jurors and therefore reversed the defendant's convictions and remanded for a new trial. *Id.* at 361-62. The same reasoning and result apply here, as the State's purported "concerns" regarding juror 27's "ability with regards to joining this jury and being able to reach a verdict" are neither

consistent with nor established by juror 27's answers to the State's limited questions on this topic.

Moreover, at least one of the GR 37(g) considerations—subsection (i)—weighs strongly against the State's peremptory challenge. GR 37(g)(i) states that courts should consider "the number and types of questions posed to the prospective juror, which may include consideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the alleged concern or the types of questions asked about it." Here, the State did not ask juror 27 any follow-up questions regarding his ability to reach a verdict or join the jury. *Lahman* is instructive regarding this consideration. There, during a domestic violence trial, the trial court permitted the State to exercise a peremptory challenge against a 23-year-old man with an Asian surname based on his age, lack of experience with domestic violence, and limited life experience. 17 Wn. App. 2d at 929, 936. But the State did not ask the juror about his life experiences and "posed very few questions to [the juror], thus depriving [him] of a realistic opportunity to explain himself and his circumstances." *Id.* at 936. On appeal, the court concluded this lack of questioning was one consideration that, on balance, could lead an objective observer to view race or ethnicity as a factor in the exercise of the peremptory challenge and that the trial court erred in overruling the defendant's GR 37 objection. *Id.* at 938.

Similarly here, the State did not ask juror 27 specific questions regarding its proffered reason for exercising the peremptory strike. It did not ask whether juror 27 would be able to join the jury, nor did it ask a single question regarding the

juror's ability to reach a verdict in this case. Thus, the State's limited interaction with juror 27 failed to reveal whether the juror truly would have an inability to reach a verdict or join the jury's deliberations or decision. Relatedly, *State v. Jefferson*, 192 Wn.2d 225, 429 P.3d 467 (2018) (plurality opinion), "warns of nebulous justifications for peremptory strikes, since such justifications may serve to mask a party's conscious or unconscious racism." *Omar*, 12 Wn. App. 2d at 754. As discussed above, the State's proffered reasons were both nebulous and unsubstantiated.

Lastly, the trial court also erred in its ruling on Craton's GR 37 objection in at least two distinct ways, the first of which is that the court did not complete the full analysis as required under GR 37. GR 37(e) states the trial court "shall then evaluate the reasons given to justify the peremptory challenge" to determine whether "an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge." The court did not engage in this analysis here; instead, it found that "the state has articulated a basis upon which to exclude this juror that is nondiscriminatory" and accepted that proffered basis without further analysis. Second, the court applied an erroneous legal standard, concluding there was no evidence "that *would* suggest there is exclusion for bias." (Emphasis added). But "GR 37 is clear, the court's determination should be based on whether an objective observer 'could' view race as a factor, not whether it would." *Tesfasilasye*, 200 Wn.2d at 361.

Based on the totality of the circumstances, we conclude an objective observer could view race or ethnicity as a factor in the use of the State's

peremptory challenge against juror 27. As our Supreme Court held in *Bell*, 5 Wn.3d at 72, the remedy for this violation of GR 37 is to reverse Craton's conviction and remand for a new trial.

III

Although we reverse Craton's conviction and remand for a new trial based on the GR 37 violation discussed above, we address the following evidentiary errors that Craton raises on appeal as they are likely to recur on remand. *See State v. Pierce*, 169 Wn. App. 533, 538, 280 P.3d 1158 (2012).

A.    Evidence of flight

Craton argues the trial court abused its discretion by admitting evidence of her and Bushman's flight from police as evidence of her consciousness of guilt. We disagree.

On September 19, 2023, while on his way to work, Officer Saul observed a white Volkswagen GTI on the road that matched the description provided in the bulletin Detective Gaffin had sent to law enforcement agencies and reported this to on-duty law enforcement. Officer Baboucarr Hydara, a patrol officer for the Lynnwood Police Department, followed the vehicle into a cemetery and parked his marked patrol vehicle behind it. Officer Saul stayed behind and parked about a block away. Officer Hydara observed Bushman in the driver's seat of the vehicle and Craton in the front passenger seat. Bushman exited the vehicle, walked to a dog that was in front of the vehicle, picked up the dog, and walked back to the vehicle. While Bushman was walking back to the vehicle, Officer Hydara announced over his patrol vehicle's PA system that Bushman was detained, was

not free to leave, and was to stop. Bushman ignored Officer Hydara's instructions, entered the Volkswagen, and drove it in reverse into a tree. Officer Hydara had to offset his patrol vehicle to avoid being hit.

After the Volkswagen hit the tree, both Bushman and Craton exited the vehicle and ran. In the meantime, Officer Muneeb Ahmad, a patrol officer for the Lynnwood Police Department, had also arrived at the cemetery and observed the vehicle hit the tree and its two occupants run away. Officer Ahmad and Officer Hydara pursued Craton and Bushman. Officer Hydara ordered Craton to stop running but Craton continued to run away "with her hand in her waist area in the front." Officer Hydara "caught up to her and then tackled her to the ground" and arrested her. When Officer Hydara asked Craton why she ran, Craton responded, "Yeah, it scared me." Officer Saul then joined the other officers on scene and assisted with taking custody of Craton.

During pre-trial motions, Craton sought to exclude any evidence of her and Bushman's flight from law enforcement. She argued there was insufficient evidence, without relying on speculation, that her flight establishes consciousness of guilt. And in a subsequent motion, she argued evidence regarding Bushman's flight was wholly irrelevant. The trial court denied both motions. Then, during its case-in-chief, the State called several officers to testify about Craton's and Bushman's flight from police. First, the State called Officer Saul who testified that no one was in the Volkswagen when he arrived at the cemetery and that he took custody of Craton from Officer Hydara so that Officer Hydara could assist Officer Ahmad in "chasing" and looking for Bushman. Defense counsel then elicited

- 12 -

testimony on cross-examination that Bushman was eventually located while attempting to carjack another vehicle. Second, the State called Officer Ahmad who testified that both Bushman and Craton ran away from law enforcement. Third, the State called Officer Brooke Silveira, a patrol officer and crime scene technician for the Lynnwood Police Department, who testified that when she arrived on scene, law enforcement had "one in custody and one outstanding" and that Bushman was "running southbound through the wood line." Fourth, the State called Officer Hydara, who testified about his observations of Bushman's flight and his role in Craton's arrest. Additionally, the trial court admitted several photographs of the white Volkswagen after it hit the tree and Officer Hydara's body-worn camera footage that showed him chasing, tackling, and arresting Craton.

Evidence of a defendant's flight may be admissible to show consciousness of guilt. *State v. Slater*, 197 Wn.2d 660, 667-68, 486 P.3d 873 (2021). When such evidence is proffered, the trial court "must first decide whether or not the proposed evidence amounts to a reasonable inference of flight that is more than mere speculation and supports a consciousness of guilt." *Id.* at 674. For such evidence to be admissible,

> the circumstances or inference of flight must be substantial and real. It may not be speculative, conjectural, or fanciful. In other words, the evidence or circumstances introduced and giving rise to the contention of flight must be substantial and sufficient to create a reasonable and substantive inference that the defendant's departure from the scene of difficulty was an instinctive or impulsive reaction to a consciousness of guilt or was a deliberate effort to evade arrest and prosecution. Pyramiding vague inference upon vague inference will not supplant the absence of basic facts or circumstances from which the essential inference of an actual flight must be drawn.

*Id.* at 668 (quoting *State v. Bruton*, 66 Wn.2d 111, 112-13, 401 P.2d 340 (1965)). Evidence of flight "tends to be only marginally probative as to the ultimate issue of guilt or innocence." *State v. Freeburg*, 105 Wn. App. 492, 498, 20 P.3d 984 (2001)).

> Thus, in determining the probative value of flight evidence, we examine
>
> the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.

*Slater*, 197 Wn.2d at 668-69 (quoting *Freeburg*, 105 Wn. App. at 498). If the trial court determines the evidence does support a consciousness of guilt inference, it may allow the jury to consider the evidence as "'a circumstance, along with other circumstances of the case, in determining guilt or innocence.'" *Id.* at 668 (quoting *Bruton*, 66 Wn.2d at 112). We review a trial court's decision to admit or exclude evidence of flight for abuse of discretion, which occurs when the trial court's decision is manifestly unreasonable or based on untenable reasons or grounds. *Id.* at 674.

Regarding the admission of evidence of Craton's flight, we conclude the trial court did not abuse its discretion. First, in determining the probative value of this evidence by analyzing the four inferences listed above, Craton's behavior, including getting out of the Volkswagen and running from Officer Hydara and Officer Ahmad, clearly supports an inference of flight. Second, Craton's flight from law enforcement presents a quintessential circumstance where Washington courts have deemed evidence of flight admissible as evidence of consciousness of guilt.

*See id.* at 669-70 (citing cases where flight evidence was deemed admissible when the defendant attempted to escape police contact). Third, there are several circumstances that could lead to a reasonable inference of consciousness of guilt regarding the Public Storage burglary, including the proximity in time to the burglary, Craton's proximity at the time of flight to Bushman (the other individual who committed the burglary), and Craton's flight from the vehicle that was used in the commission of the burglary. While an inference could be drawn that Craton ran from law enforcement for other reasons, such as her active warrants in other cases, her behavior reasonably supports a consciousness of guilt inference specifically regarding the Public Storage burglary. Thus, the trial court did not abuse its discretion in allowing the jury to consider it as one circumstance in determining her guilt or innocence.

Turning to the evidence of Bushman's flight, we likewise reject Craton's argument that the trial court abused its discretion in admitting this evidence. Craton argues on appeal that evidence of Bushman's flight was inadmissible because none of it allowed a direct inference as to her consciousness of guilt for the burglary. Craton's argument misses the mark because the State did not argue and the trial court did not rule that evidence of Bushman's flight was admissible to show Craton's consciousness of guilt for the burglary. Instead, the dispositive issue in the trial court, as well as on appeal, is whether evidence related to Bushman's flight from police was properly admitted for purposes *other than* to show Craton's consciousness of guilt.[1] Because Craton does not meaningfully

---

[1] When asked to explain the purpose of admitting evidence of Bushman's flight—as distinct from Craton's flight—the State explained: "The purpose of the state in introducing this is the state has

address the trial court's analysis, she fails to establish that the trial court abused its discretion in admitting the evidence of Bushman's flight.

B.     Statement against interest

Craton argues the trial court abused its discretion by admitting Bushman's hearsay statement made in a recorded jail call.  We disagree.

Bushman was released before his trial for second degree burglary began and had several unrecorded phone conversations with Detective Gaffin.  During these conversations, Bushman made vague statements about his guilt and indicated he wanted to take "the fall" and "responsibility" for the burglary and wanted to leave someone else out of it.  Although Bushman returned to Detective Gaffin some of the property stolen from the Public Storage facility, he never admitted to unlawfully entering any units.  Then, on September 27, 2023, 11 days after the burglary, Bushman called Craton, who was still in jail, and told her on a recorded call, "So the detectives say they need to talk to you.  I told them that I - - everything was on me, so."

During Craton's trial, the State sought to admit Bushman's recorded statement to Craton for the truth of the matter asserted under the hearsay exception for statements against interest.  During voir dire outside the presence of the jury, the State questioned Detective Gaffin about his conversations with Bushman and about Bushman's statement to Craton.  Over Craton's objection, the

---

to prove that there were two individuals that were arrested in the vehicle itself."  The state added, "we have to account for what happened in between, specifically when officers arrived and thereafter, just because they were not specifically arrested in the vehicle."  The State similarly argues on appeal that "evidence related to Bushman's flight from police was properly admitted for purposes other than evidence of Craton's consciousness of guilt."

trial court admitted Bushman's statement as a statement against interest. The court had previously found Bushman was unavailable based on his assertion of his Fifth Amendment privilege, and now determined that there was sufficient corroboration to support Bushman's statement to Craton. Lastly, the court concluded Bushman's statement "increased his criminal liability" because "this is the only recorded statement where he said something to this effect" and "this would be more compelling testimony and admission [than] would be the testimony of a police officer." The trial court admitted Bushman's statement and published it for the jury immediately before the State rested its case.

While hearsay statements are generally inadmissible, an unavailable declarant's hearsay statement may be admissible under several exceptions, including under ER 804(b)(3) as a "statement against interest." A statement against interest is one

> which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. In a criminal case, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

ER 804(b)(3). Thus, such statements are admissible when three requirements are met: (1) the declarant is unavailable to testify, (2) the declarant's statement must tend to subject them to criminal liability, and (3) the statement must be corroborated by circumstances indicating its trustworthiness. *State v. J.K.T.*, 11 Wn. App. 2d 544, 566, 455 P.3d 173 (2019). "While the reach of Rule 804(b)(3) is

not limited to direct confessions of criminal responsibility, the declarant's statements must, in a real and tangible way, subject [the declarant] to criminal liability." *State v. Gee*, 52 Wn. App. 357, 362, 760 P.2d 361 (1988). We review a trial court's decision to admit or exclude such evidence for abuse of discretion, which occurs when the trial court's decision is manifestly unreasonable or based on untenable reasons or grounds. *Id*.

Here, the trial court did not abuse its discretion by admitting Bushman's statement because all three ER 804(b)(3) requirements are met. To the first requirement, the trial court found that Bushman was unavailable based on his assertion of his Fifth Amendment privilege. To the second requirement, Bushman's statement to Craton that "everything was on me" tends to subject him to criminal liability. As the trial court noted, Bushman's conversations with Detective Gaffin were not recorded. Additionally, during his conversations with Detective Gaffin, Bushman never explicitly admitted to unlawfully entering any of the Public Storage units. It was reasonable for the trial court to conclude Bushman's own words recorded in a call with Craton would be "more compelling testimony and an admission" than Detective Gaffin's recollection of Bushman's statements to him and would thus tend to subject Bushman, in a real and tangible way, to criminal liability. Lastly, to the third requirement, the State presented sufficient corroborating circumstances that Bushman told Detective Gaffin that the Public Storage burglary on September 16 was "on me." During Detective Gaffin's voir dire, he testified that Bushman made statements about his guilt and wanting to "take the responsibility for what they had done." Accordingly, the trial court did

not abuse its discretion in concluding there was sufficient corroboration for Bushman's statement to Craton and in admitting Bushman's statement under ER 804(b)(3).

Despite this, Craton argues Bushman's statement was too ambiguous to be admissible because it is not clear whether Bushman was addressing the September 16 Public Storage burglary or a different matter. But the entire statement provides sufficient context that Bushman was referring to the September 16 burglary. Bushman had conversations with Detective Gaffin about the September 16 burglary and about returning stolen property to Detective Gaffin and, in fact, did return to law enforcement stolen property from this burglary. In this context, it is sufficiently clear that Bushman's statement was regarding the Public Storage burglary and thus passes the threshold determination of relevance under ER 401.

Next, Craton relies on *Gee* to argue Bushman's statement does not meet the second requirement under ER 804(b)(3)—that it subjected him to criminal liability—but her reliance is misplaced. In *Gee*, an undercover police officer agreed to purchase cocaine from Lea Ann Barrey, who then had her friend, Randy Gee, deliver the cocaine. 52 Wn. App. at 359. Police arrested both Barrey and Gee and charged Gee with violation of the Uniform Controlled Substances Act. *Id.* at 359-60. At trial, Gee sought to introduce under ER 804(b)(3) Barrey's statements that Gee "should not have been there" and that Gee was not involved. *Id.* at 360-62. The trial court excluded Barrey's statements and this court affirmed because the statements Gee sought to introduce contained "no express assertions of past

fact that could incriminate Barrey" and it did not "improve the case against her to state that a third party was not a participant and should not have been present." *Id.* at 362. Here, by contrast, Bushman's statement that "everything was on me" is an assertion of fact that subjects Bushman to criminal liability "in a real and tangible way." *Id.* at 362. Thus, *Gee* does not support Craton's argument.

Lastly, Craton argues Bushman's statement was unreliable under the nine-factor test used to determine trustworthiness. Those nine factors are:

1. Was there an apparent motive for declarant to lie?
2. What was the declarant's general character?
3. Did more than one witness hear declarant's statement?
4. Was the statement made spontaneously?
5. Did the timing of the statements and the relationship between declarant and witness suggest trustworthiness?
6. Does the statement contain an express assertion of past facts?
7. Did the declarant have personal knowledge of the identity and role of the crime's other participants?
8. Was the declarant's statement based upon faulty recollection?
9. Was the statement made under circumstances that provide reason to believe the declarant misrepresented defendant's involvement in the crime?

*J.K.T.*, 11 Wn. App. 2d at 567 (quoting *State v. Roberts*, 142 Wn.2d 471, 497-98, 14 P.3d 713 (2000)). These factors aid courts in determining "the adequacy of corroborating circumstances." *State v. Young*, 160 Wn.2d 799, 811, 161 P.3d 967 (2007).

Craton argues Bushman's statement was unreliable when considering these nine factors because Bushman had an apparent motive to lie as he "did not want his girlfriend to be mad," and the statement was contradicted by the evidence. But Bushman's statement was not admitted to prove that he was the only one who committed the burglary. Rather, it was admitted to prove that he told Craton

"everything was on me." As discussed above, this statement was sufficiently corroborated by Detective Gaffin's testimony during his voir dire. Accordingly, the trial court did not abuse its discretion by admitting Bushman's recorded hearsay statement.

IV

We reverse Craton's convictions without prejudice and remand for a new trial.

Feldman, J.

WE CONCUR:

Birk, J.

Coburn, J.